**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| **KIMBERLY FAIR,** *individually and on behalf of others similarly situated,* | |
| *Plaintiff,* | |
| v. | Case No.: |
| **RED CYPRESS GROUP,** *doing business as* **VALLEY SERVICING, ASHLEY BLAKE COLLINS, STANLEY CHAO, ARB RISK MANAGEMENT HOLDINGS, LLC, KASHIA SERVICES, DERRICK J. FRANKLIN, and ALYSSA FRANKLIN,** | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

## CLASS ACTION COMPLAINT

COMES NOW the Plaintiff, **Kimberly Fair** ("**Ms. Fair**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Ashley Blake Collins** ("**Collins**"), **Red Cypress Group**, *doing business as* **Valley Servicing, Stanley Chao** ("**Chao**"), **ARB Risk Management Holdings, LLC** ("**ARB**"), **Kashia Services** ("**Kashia Services**"), **Derrick J. Franklin** ("**Derrick Franklin**"), and **Alyssa Franklin** ("**Alyssa Franklin**") (collectively, the "**Defendants**"), stating as follows:

## DESCRIPTION OF THE CASE

1.      This is an action against the Defendants for violations of the *Fair Debt Collection Practices Act*, 15 U.S.C. § 1692, *et. seq.* ("**FDCPA**"), the *Racketeer Influenced and Corrupt Organizations Act*, 18 U.S.C. § 1961, *et seq.* ("**RICO**"), the *Florida Consumer Collection Practices Act*, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**"), and Florida's *Civil Remedies for Criminal Practices Act* ("**CRCPA**"), § 772.101, Fla. Stat., *et seq.*

2.      The Defendants comprise an illegal lending enterprise that seeks to avoid state usury laws through a "Rent-A-Tribe" model.

3.      Chao and ARB operated and controlled the lending websites InboxLoan.com ("**Inbox Loan**"), InboxCredit.com ("**Inbox Credit**"), FirstLoan.com ("**First Loan**"), CometLoans.com ("**Comet Loans**"), and BetterDayLoans.com ("**Better Day Loans**") (collectively, the "**Lending Websites**").

4.      Until recently, each of the Lending Websites offered online loans to consumers in Florida.

5.      Loans issued through the Lending Websites charged interest exceeding 700% annually – rates which are illegal in most states, including Florida.

6.     Indeed, § 687.02(1), Fla. Stat., prohibits usury and caps interest rates at 18% annually.[1]

7.     Pursuant to § 687.071(3), Fla. Stat., making loans with annual interest rates greater than 45% is a third-degree felony.

8.     Loans made at usurious rates are void *ab initio* under Florida law, § 687.071(7), Fla. Stat.[2]

9.     While many of the loans issued through the Lending Websites are collected by Chao through ARB and his related entities, certain delinquent debts are assigned to Red Cypress Group, who collects debts under the names Apex Servicing and Valley Servicing.

10.    A primary method Red Cypress Group uses when attempting to collect usurious loans is to send *wage assignment* letters to the consumer's employer; such notices are designed to appear to be official wage garnishment notices sent by a court of law, and claim the employer is required to garnish the consumer's wages and remit payment to the Lending Website, such as "Inbox Credit."

---

[1] Certain exceptions permit interest up to 30% annually; however, such exceptions are inapplicable to the present matter. *See, e.g.,* § 516.031, Fla. Stat.

[2] Any person who willfully makes a loan with annual interest rates exceeding 25% forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." <u>Richter Jewelry Co. v. Schweinert</u>, 169 So. 750, 758-59 (Fla. 1935).

11.     Despite their appearance, these are not official or court-issued wage garnishment notices.

12.     These *faux* "wage assignment" letters – which look like wage garnishment notices – are prohibited by Florida law, but nonetheless still frequently result in employers withholding money from the consumer's paycheck as payment for debts which were unlawful upon origination.

13.     When said employers forward consumer's wages to as instructed, Red Cypress Group retains a percentage of the funds as their fee or commission.

## JURISDICTION AND VENUE

14.     Subject matter jurisdiction for Plaintiff's federal claims arises under the FDCPA, 15 U.S.C. § 1692k(d), RICO, 18 U.S.C. § 1965, and 28 U.S.C. § 1331.

15.     This Court has supplemental jurisdiction for Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

16.     This Court may also exercise diversity jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d)(2) as the matter in controversy exceeds $5,000,000 and a member of a class of the plaintiffs is a citizen of a different state from one or more of the defendants.

17.     Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this cause of action occurred within Florida, including in this District and Division.

## PARTIES

18.    **Ms. Fair** is a natural person residing in the City of Ruskin, Hillsborough County, Florida.

19.    Ms. Fair is a *Consumer* as defined by the FDCPA and the FCCPA, 15 U.S.C. § 1692a(3) and § 559.55(8), Fla. Stat., respectively.

20.    Ms. Fair is also known as Kimberly O'Gara.

21.    **Chao** is a natural person and the owner, manager, and chief executive of ARB.

22.    Chao is involved in the day-to-day operations of ARB, and is the individual responsible for the determination of, and implementation of, the policies and procedures of ARB.

23.    Chao has the ability to review collection communications made by ARB.

24.    Chao is responsible for reviewing any and all regulations affecting his business, or alternatively, is responsible for hiring personnel to ensure the company he manages is in compliance with those regulations.

25.    Chao is also aware of any complaints filed against ARB through the Consumer Financial Protection Bureau, any state Attorney General office, or court of law.

26.    Chao resides at **10443 Los Feliz Dr., Orlando, FL 32836.**

27.    **ARB** is a Delaware limited liability company with a principal address of 4700 Millenia Blvd., Suite 270, Orlando, FL 32839.

28.     ARB is registered to conduct business in Florida, where its registered agent is **Robert Lopez, 4700 Millenia Blvd., Suite 270, Orlando, FL 32839.**

29.     **Collins** is a natural person and the owner and manager of Red Cypress Group.

30.     Collins is involved in the day-to-day operations of Red Cypress Group, including its operations as Valley Servicing and Apex Servicing, and is the individual responsible for the determination and implementation of the policies and procedures of Red Cypress Group.

31.     Collins has the ability review any collection communications made by Red Cypress Group, doing business as Valley Servicing, and Apex Servicing.

32.     Collins is responsible for reviewing any and all regulations affecting his business, or alternatively, is responsible for hiring personnel to ensure the company he manages is in compliance with those regulations.

33.     Collins is also aware of any complaints filed against Red Cypress Group, Valley Servicing, and Apex Servicing through the Consumer Financial Protection Bureau, any state Attorney General office, or court of law

34.     Collins lives at **1808 S. Sailors Way, Gilbert, AZ 85295.**

35.     **Red Cypress Group** is an entity of unknown designation.

36.     Red Cypress Group conducts business at **333 South Main Street, Blanding, UT 84511.**

37.     Upon information and belief, Red Cypress Group conducts business using the fictitious names Apex Servicing and Valley Servicing.

38.     Alternatively, Apex Servicing and Valley Servicing are distinct legal entities from Red Cypress Group, and Red Cypress Group holds an ownership interest in both Apex Servicing and Valley Servicing. Should discovery reveal that Apex Servicing and Valley Servicing are distinct entities, Plaintiff will seek leave to amend the Complaint to name Valley Servicing as a defendant.

39.     Collins and Red Cypress Group are *Debt Collectors* as defined by the FDCPA and the FCCPA, as they use instrumentalities of interstate commerce, including the mail, for their businesses, the principal purposes of which are the collection of debts, and/or they regularly collect or attempt to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

40.     **Kashia Services** is a tribal lending entity formed by the Kashia Band of Pomo Indians of the Stewart Point Rancheria ("**Kashia Tribe**")**.**

41.     Kashia Services is the listed lender on loans issued through Inbox Loans.

42.     Kashia Services has its office at **1400 Guerneville Road, Suite 2, Santa Rosa, California**.

43.     **Derrick Franklin** is a California resident who is the chairman of Kashia Services.

44.     Derrick Franklin directs the operation of the Kashia Tribe's lending businesses and is thus directly involved in the management and supervision of Kashia Services.

45.     Derrick Franklin has a last known address at **4414 Culebra Ave, Apt D, Santa Rosa, CA 95409**.

46.     Derrick Franklin is named as a defendant in his individual capacity.

47.     **Alyssa Franklin** is a citizen of California employed by the Kashia Tribe as an office manager for Kashia Services.

48.     Alyssa Franklin oversees the day-to-day operations of Kashia Services' lending operations.

49.     Alyssa Franklin has a last known address at **4436 Rinconada Drive, Santa Rosa, CA 95409**.

50.     Alyssa Franklin is named as a defendant in her individual capacity.

## FACTUAL ALLEGATIONS

### Chao's Rent-A-Tribe Payday Loan Syndicate

51.     Chao is an Orlando-area businessman with a long history of operating online lending platforms which make loans to consumers at triple-digit interest rates.

52.     These websites each purported to be owned and operated by small, remote, economically impoverished Native American tribes.

53.     In reality, through ARB and its subsidiaries, Chao exerted near total control over each of the Lending Websites.

54.     For example, Comet Loans, a Chao-controlled lender, was purportedly owned and operated by the Tonto Apache Tribe, a tribe in rural Payson, Arizona, about 95 miles northeast of Phoenix.

55.     The Tonto Apache Tribe has 110 enrolled members and an 85-acre reservation, the smallest of any Native American reservation in Arizona.

56.     Due to its small size, lack of natural resources, and remote location, the Tonto Apache Tribe has historically struggled economically.

57.     While the Tonto Apache Tribe owned Comet Loans on paper, the primary beneficiaries of Comet Loans were Chao, his companies, and his non-tribal investors, who act as "service providers" and "investors."

58.     Chao offered the Tonto Apache Tribe a tiny percentage of revenue the loans generated, in exchange for the Tonto Apache Tribe claiming ownership of the illegal payday lending operations.

59.     However, Chao, his companies, and his non-tribal investors – and not the Tonto Apache Tribe – provided all essential services for Comet Loans, including funding, underwriting, advertising, management, and collection.

60.     On information and belief, the Tonto Apache Tribe received somewhere between one and two percent of loan revenues as compensation for

claiming to own the tribal lending entity and providing a veil of sovereign immunity.

61.    Such arrangements with Native American tribes are known as *rent-a-tribe schemes*.

62.    In such schemes, non-tribal payday lenders attempt to create the appearance of sovereign immunity and assert in the fine print of the terms and conditions on their websites that they have immunity from state laws which prohibit usury.

63.    The non-tribal payday lenders make loans in the name of a Native American tribal lending entity, claiming the loans are subject only to the law of the particular tribe and expressly disavow they are subject to any state law.

64.    In reality, the tribal lending entity is a mere front for an illegal lending scheme, and often a paper-thin one.

65.    All substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are controlled by and generally performed by individuals and entities that are unaffiliated with the Native American tribe.

66.    First Loan, purportedly owned and operated by the Elem Band of Pomo and Sulfur Bank Band of Pomo Indians ("**Elem Tribe**"), was similarly operated.

67.     The Elem Tribe is a group of Pomo Indians based on 50 acres near Clearlake Oaks, California.

68.     The Elem Tribe has marginal economic activities due to its small size, remote location, and lack of natural resources.

69.     The notion that First Loan operated as a legitimate arm of the Elem Tribe is even more dubious in light of the fact that, in the recent past, First Loan claimed to be owned by a different, unrelated Indian tribe – the Kashia Tribe.

70.     Not coincidentally, the Kashia Tribe was also the most recent "owner" of Inbox Loans and Better Day Loans, two of Chao's other lending businesses.

71.     Prior to the Kashia Tribe claiming ownership of Inbox Loans through Kashia Services, the website was purportedly owned by the Fort Belknap Indian Tribe of Montana– an unrelated Native American tribe.

72.     Upon information and belief, Chao and his related entities switched tribal affiliation from the larger Fort Belknap Indian Tribe of Montana to the smaller Kashia Tribe because the Kashia Tribe was willing to accept a lower percentage of revenue as "rent."

73.     Chao owns a significant number of other entities related to alleged tribal online lending as well, including Sabre Analysis, LLC ("**Sabre**"), whose listed address is identical to ARB's – 4700 Millenia Blvd., Suite 270, Orlando, FL 32839.

74.    Sabre's website claims it is a "portfolio servicing company specializing" in "Data Analytics, Lead Purchase Strategy, Collections Strategies (and) Reporting."

75.    Chao also owns ARB Call Facilities, which provides call center services for the Lending Websites, with call centers in Costa Rica, the Philippines, Egypt, and other locations.

## The Lending Websites Share One Server

76.    Domain name registration records show that, at all times relevant, InboxLoan.com had an IP address of 52.43.81.11, which resolves to a server hosted by Amazon.com in Oregon (the "**Server**"). **SEE PLAINTIFF'S EXHIBIT A.**

77.    The Server hosted exactly 10 websites, each and every one of which was (and in some cases, still is) owned by Chao, including FirstLoan.com, InboxLoan.com, BetterDayLoans.com, ARBCalls.com, and ARBCares.com. *Id.*

78.    Domain registration records from June 16, 2014, show that Inbox Loan's website, www.inboxloans.com, listed "Stanley Chao" as the registrant's name, with an email address of "stanley@arb-co.com" as the administrative, technical, and registrant contacts. **SEE PLAINTIFF'S EXHIBIT B.**

79.    Credit inquiries by Inbox Loans made to Trans Union, a nationwide credit reporting agency, show the address of Inbox Loans to be "50 Tice Blvd., Suite 160, Woodcliff Lake, New Jersey 07677." **SEE PLAINTIFF'S EXHIBIT C.**

80.     That address is the registered address of *Inbox Auto, LLC*, whose only officer is Stanley Chao.

81.     The Lending Websites, despite claiming ownership by different tribes and different tribal lending entities, have all recently ceased operations.

82.     Each of the Lending Websites now displays a near-identical message indicating they have ceased operations.

83.     The only difference in the messages displayed on each of the Lending Websites is the contact phone number, as the verbiage is identical. See, e.g., http://inboxloan.com/ (last visited April 14, 2023).

84.     At all times relevant, Chao and his various companies effectively controlled each of the Lending Websites, as they registered the domain names for the lending websites, built the websites, bought leads from lead generators and then advertised the Lending Websites to potential borrowers, obtained consumer credit reports to evaluate potential borrowers, serviced and collected the loans, and retained the vast majority of the profits from the loans.

85.     On information and belief, Chao, through ARB, was responsible for setting policies concerning the post-charge-off collection of balances claimed owed to the Lending Websites.

86.     These policies include placing charged-off balances for collection with Red Cypress Group.

87.    On information and belief, Chao and ARB receive a portion of any funds collected by Red Cypress Group.

88.    Valley Servicing, on its website, claims to be owned by the Wakpamni Lake Community Corporation ("WLCC") of the Oglala Sioux Tribe of the Pine Ridge Indian Reservation (the "Oglala Sioux Tribe").

89.    However, neither the Oglala Sioux Tribe's name, nor the name of the WLCC, appears anywhere in any written communication sent to Plaintiff or to Plaintiff's employer.

90.    The Oglala Sioux Tribe's reservation is in Pine Ridge, South Dakota, whereas Red Cypress utilizes addresses in Utah and Arizona – more than 1,000 miles from the reservation.

91.    Assuming, *arguendo*, that the Oglala Sioux Tribe are aware its name is being used by Red Cypress Group in connection with Apex Servicing and Valley Servicing, and has authorized the use of its name, the Oglala Sioux Tribe are paid only a small fraction of the income generated by Red Cypress Group.

92.    The majority – or, possibly all -- of the profits retained by Red Cypress Group benefit Collins, the beneficial non-tribal owner of Red Cypress Group, with the various other non-tribal "service providers" for the tribal lending entities, such as Chao and ARB, retaining the rest.

93.     Other than Apex Servicing and Valley Servicing, every other WLCC-related business claims to operate in Wakpamni Lake or Pine Ridge, South Dakota, purportedly on the Oglala Sioux's reservation.

94.     Valley Servicing lists a Post Office box in Mesa, Arizona, as its mailing address and its website gives 3651 E. Baseline Rd., Suite E-130, Gilbert, AZ 85295 as its physical address. **SEE PLAINTIFF'S EXHIBIT D.**

95.     Public records show the address is registered to Christian Miller Insurance Agency, LLC ("**Miller Insurance**"), an independent agent for State Farm Insurance.

96.     Collins, the true owner of Valley Servicing, lives in Gilbert, AZ as well, less than 10 miles away.

97.     Apex Servicing's website lists its physical address as 333 South Main Street, Blanding, Utah 84511.  **SEE PLAINTIFF'S EXHIBIT E.**

98.     This address is the same as the address which Red Cypress Group provided to Zions Bank in an April 2020 PPP loan application. https://www.federalpay.org/paycheck-protection-program/red-cypress-group-blanding-ut (last visited March 6, 2023).  **SEE PLAINTIFF'S EXHIBIT F.**

99.     A search of publicly-available images of 333 South Main Street, Blanding, Utah shows no business called "Red Cypress Group" or "Apex Servicing" actually existing at this location.

100.   The 333 South Main Street address is an arts-and-crafts store selling pottery and other souvenirs with no discernible relationship to debt collection, wage assignment, payday lending, or similar. **SEE PLAINTIFF'S EXHIBIT G.**

101.   The websites of Valley Servicing and Apex Servicing are virtual carbon-copies of each other, other than the names of the business, addresses, and phone numbers.

102.   Apex Servicing sends out "Wage Assignment Demand Notices" to the employers of consumers which are identical in formatting and verbiage to those sent by Valley Servicing. An example of a notice sent by Apex Servicing is attached as **PLAINTIFF'S EXHIBIT H.**

103.   Apex Servicing collects loans issued by the same lending websites as Valley Servicing.

104.   The "Wage Assignment Demand Notices" that "Apex Servicing" mails and faxes to employers contain a PO Box address – PO Box 667, Blanding, UT 84511.

105.   Again, assuming the WLCC is aware of its name and logo being used in connection with Apex Servicing and Valley Servicing, the businesses do not operate as legitimate arms of the Oglala Sioux Tribe as they: (a) are not located on tribal land and in fact are located in other states; (b) do not in any way promote

the economic interests of the Oglala Sioux Tribe; and, (3) operate primarily – and, possibly, *exclusively* – for the benefit of non-tribal individuals.

### Chao's Prior Use of 'Wage Garnishment' Documents

106.    On November 18, 2019, the Washington State Department of Financial Institutions issued a consumer alert stating: "an entity using the name Apex Servicing has sent letters to employers in Washington attempting to garnish wages from employee paychecks for alleged loans owed to Inbox Loan and First Loan." *See* https://dfi.wa.gov/consumer/alerts/apex-servicing-unlicensed-debt-collection (last visited March 1, 2023).

107.    Washington's State Department's alert stated that letters labelled as "Wage Assignment Demand Notice" were sent to employers, alleging that employees had signed a Wage Assignment and authorized Kashia d/b/a Inbox Loan and/or Kashia d/b/a First Loan to collect wages from the employer to repay the loan. *Id.*

108.    This alert warned consumers that Apex Servicing is not a licensed collection agency in Washington and that Inbox Loan and First Loan are not licensed to conduct business in the State. *Id.*

109.    The above illustrates that First Loan was, at that point in time, purportedly operated by the Kashia Tribe, which has no known relationship to the Elem Tribe.

110.   Neither Red Cypress Group, Valley Servicing, Apex Servicing, nor First Loan are licensed as consumer collection agencies in Florida.

111.   The Defendants know that Wage Assignments are invalid under § 516.17, Fla. Stat., and that the collection of their loans, through Wage Assignment Demand Notices, issued by Red Cypress Group, violates Florida law, as they have been sued previously for such conduct.  See, *e.g.*, *Venisha Beckford v. Elem Indian Colony of Pomo Indians, Hiram Campbell, Sarah Brown Garcia, ARB Risk Management Holdings, LLC and Stanley Chao,* Case Number 8:20-cv-02103 (September 9, 2020, M.D. Fla.); *Juan Guevara v. Stanley Chao, ARB Risk Management Holdings, LLC, Apex Servicing, Valley Servicing, and Comet Loans,* Case Number 8:22-cv-00540 (March 8, 2022, M.D. Fla.).

## Collins' Long History In Rent-A-Tribe Schemes

112.   Collins, along with his partner, Chad Jardine ("**Jardine**") began operating an online lending company called FloBridge in 2009.

113.   The business operated from www.flobridge.com and made loans to consumers, including consumers in Florida, at interest rates usually exceeding 600% annually.

114.   By 2010, the State of Idaho had issued a cease-and-desist order concerning FloBridge, as the lender lacked licensure and illegally attempted to garnish the wages of borrowers.

115.    In 2011, FloBridge was ordered to pay restitution to impacted Idaho residents.

116.    FloBridge was also sued by the Minnesota Attorney General and California Department of Corporations in 2011 for unlicensed and unlawful lending.

117.    Around this time, Collins and Jardine met with Raycen American Horse Raines ("**Raines**"), a member of the Oglala Sioux Tribe.

118.    The WLCC was established by Raines in 2012, when he convinced certain members of the Oglala Sioux Tribe to act as a payday lending "cover" for a non-tribal entity based in Arizona called Cash Cloud, LLC ("**Cash Cloud**") – an online lending platform which made loans at an average interest rate of 782%, owned by Collins and Jardine.

119.    Cash Cloud would pay a fee of $5 per new loan to the Oglala Sioux Tribe, and if more than $100,000 of fees per month were earned, the rate would then be lowered to $2.50 per loan.

120.    The Wakpamni district is one of the nine districts that make up the Oglala Sioux's reservation.

121.    Although the reservation is governed by a reservation-wide council, the Wakpamni district has the authority to make business deals without permission from the council.

122.    Raines proposed that he keep 50% of the money received from Cash Cloud, and the Wakpamni district would receive the other 50%.

123.    The Wakpamni district was one of the most impoverished of the nine districts of the reservation, which itself was highly economically unstable, with unemployment rates often topping 80%.

124.    The financial situation of the Wakpamni Tribe at the time it was approached by Raines made it susceptible to this "rent-a-tribe" scheme.

125.    "If we make $2.50, that is $2.50 we didn't have before," said Sandy Two Lance, president of the Wakpamni district. Nicholas Nehamas, *The Tribe That Said No: How one rogue tribal member tried to drag the Oglala Sioux into payday lending*, Al Jazeera America, June 18, 2014, http://projects.aljazeera.com/2014/payday-nation/sioux-tribe-payday.html.

126.    Geneve Lone Hill, a tribal member and the president of WLCC, stated to Nehamas that she had no problem with the loans because "**they were not made on the reservation**." *Emphasis added*.

127.    According to a recording of the January 2012 meeting, Raines also stated, "My advice is don't take out a payday loan… Let the white people take out the loan and let us make money off them." Eamon Javers, *How Some Payday Lenders Charge Over 700% on Loans*, CNBC.com, Sept. 17, 2012, https://www.cnbc.com/id/49035819.

128.   Soon, WLCC was engaged in numerous "rent-a-tribe" agreements; more than 50 lending platforms have claimed to be owned by the WLCC.

## Usurious Lending Prohibited in Florida

129.   The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.

130.   Section 687.071(3), Fla. Stat., renders the making of loans with annual interest rates greater than 45% a third-degree felony.

131.   Section 687.071(7), Fla. Stat., states, "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

132.   In Richter, *supra*, Florida's courts recognized almost a century ago that such usurious loans are *void ab initio*.[3]

## Defendants Make Usurious Loan to Ms. Fair and Attempt Collection

133.   On or about September 30, 2019, Inbox Loan issued a loan to Ms. Fair in the principal amount of $500 (the "**Loan**").

134.   Ms. Fair repaid approximately $1,461 for the Loan.

135.   The interest rate on the Loan was over 700% annually.

---

[3] *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

136.    Due to its 700%-plus interest rate, under Florida caselaw and statute, the Loan is void *ab initio*, rendering the Loan unenforceable against Ms. Fair.

137.    The Loan therefore constitutes an *Unlawful Debt* as defined by § 772.102(2), Fla. Stat., and 18 U.S.C. § 1961(6).

138.    The Loan was for personal and household expenses and was used to purchase household goods and services.

139.    The Loan thus meets the definitions of *Debt* under by the FCCPA, Fla. Stat. § 559.55(6), and the FDCPA, 15 U.S.C. § 1692a(5).

140.    On or around February 17, 2021, Ms. Fair reached a settlement agreement with ARB and Chao regarding this Loan. **SEE PLAINTIFF'S EXHIBIT I.**

141.    At some point prior to June 30, 2022, Inbox Loan assigned the Loan to Red Cypress Group for collection.

142.    This assignment was done pursuant to policies put in place by Chao.

143.    On June 30, 2022, Red Cypress Group, doing business as Valley Servicing, faxed a *Wage Assignment Demand Notice* to Ms. Fair's employer, Visiting Angels, a senior home care provider. **SEE PLAINTIFF'S EXHIBIT J.**

144.    The Wage Assignment Demand Notice was a communication which stated the balance of the Loan was $944.57 and sought payment. *Id.*

145. The Wage Assignment Demand Notice was thus an attempt to collect the Loan.

146. The Wage Assignment Demand Notice falsely represented that Ms. Fair owed $944.57 to First Loan, when such a balance was unenforceable against Ms. Fair.

147. The Wage Assignment Demand Notice insisted that Visiting Angels, withhold 15% of Ms. Fair's pay and send it to Inbox Credit, PO Box 8490, Mesa, AZ 85214. *Id.*

148. In transmitting the Wage Assignment Demand Notice to Ms. Fair's employer, Red Cypress Group falsely represented that it had the legal right to garnish or assign a portion of Ms. Fair's wages.

149. Voluntary wage assignments on a consumer loan are not legal in Florida. *See* § 516.17, Fla. Stat.

150. Red Cypress Group, as Valley Servicing, faxed at least one more Wage Assignment Demand Notice to Ms. Fair's employer on October 4, 2022. **SEE PLAINTIFF'S EXHIBIT K.**

151. Ms. Fair became extremely upset and emotionally distraught upon learning that ARB continued to collect on a Loan that she believed had been settled in 2021.

152.   Further, Red Cypress Group disclosed derogatory, legally-protected information about Ms. Fair's purported Loan to her employer – a debt she did not legally owe – without Ms. Fair's authorization or consent.

## CLASS ACTION ALLEGATIONS

153.   Plaintiff brings this action on behalf of herself and all others similarly situated. All allegations herein are based on information and belief, except for those allegations that pertain to Plaintiff. Plaintiff's information and belief are based on, *inter alia*, the investigation conducted to date by Plaintiff and her counsel.   Each allegation in this consumer complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

### The FDCPA Class

154.   Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

155.   Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as:

**All consumers: (1) located in Florida; and (2) whose employer, within one year of the date of the filing of this complaint, received a "Wage Assignment Demand Notice" or similar notification, from Red Cypress Group, doing business as Valley Servicing or Apex Servicing, regarding a loan issued by First Loan, Comet Loans, Inbox Loans, Inbox Credit, or Better Day Loans (the "FDCPA Class").**

156.   Excluded from the FDCPA Class are the Defendants and any of their officers, directors, and employees.

157.   Plaintiff reserves the right to modify or amend the FDCPA Class definition before the Court determines whether certification is appropriate.

158.   **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder is impractical. Comet Loans, Inbox Loans, Inbox Credit, First Loan, and Better Day Loans were all heavily marketed in Florida and made a considerable number of loans to Florida consumers. Class members are therefore spread throughout the state of Florida. Although the precise number of Class members is unknown, on information and belief, there are at least 1,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants. The Class members may be notified of the pendency of this action by published or mailed notice.

159.   **Existence and Predominance of Common Questions of Law and Fact. Fed. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the FDCPA Class which predominate over questions affecting any individual Class member.  Specifically, these common questions include, without limitation: (a) whether Collins and Red Cypress Group are *Debt Collectors* as defined by the FDCPA; (b) whether the Class members' alleged debts constitute *Consumer Debts*; (c) whether the Collins and Red Cypress Group violated §§ 1692e and 1692f of the

FDCPA by attempting to collect debts which were unenforceable and by sending a "Wage Assignment Demand Notice" to the Class members' employers; and, (d) whether Plaintiff and the Class members were harmed by Collins and Red Cypress Group.

<u>**The FCCPA Class**</u>

160.   Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

161.   Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as:

> **All consumers: (1) located in Florida; and (2) whose employer, within two years of the date of the filing of this complaint, received a "Wage Assignment Demand Notice" or similar notification, from Valley Servicing or Apex Servicing, regarding a loan issued by First Loan, Comet Loans, Inbox Loans, Inbox Credit, or Better Day Loans (the "FCCPA Class").**

162.   Excluded from the FCCPA Class are the Defendants and any of their officers, directors, and employees.

163.   Plaintiff reserves the right to modify or amend the FCCPA Class definition before the Court determines whether certification is appropriate.

164.   **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder is impractical.  Comet Loans, Inbox Loans, Inbox Credit, First Loan, and Better Day Loans were all heavily marketed in Florida and made

a considerable number of loans to Florida consumers. Class members are therefore spread throughout the state of Florida.  Although the precise number of Class members is unknown, on information and belief, there are at least 1,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants.  The Class members may be notified of the pendency of this action by published or mailed notice.

165.   **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the FCCPA Class which predominate over questions affecting any individual Class member.  Specifically, these common questions include, without limitation: (a) whether the Class members' alleged debts constitute *Consumer Debts*; (b) whether the Defendants violated § 559.72(9) of the FCCPA by attempting to collect debts which were unenforceable and by sending a "Wage Assignment Demand Notice" to the Class members' employers; and, (c) whether Plaintiff and the Class members were harmed by the Defendants.

## The CRCPA Class

166.   Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

167.    Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as**:**

> **All consumers: (1) located in Florida; (2) whose employer, within five years of the date of the filing of this complaint, received a "Wage Assignment Demand Notice" or similar notification, from Valley Servicing or Apex Servicing, regarding a loan issued by First Loan, Comet Loans, Inbox Loans, Inbox Credit, or Better Day Loans (the "CRCPA Class").**

168.    Excluded from the CRCPA Class are the Defendants and any of their officers, directors, and employees.

169.    Plaintiff reserves the right to modify or amend the CRCPA Class definition before the Court determines whether certification is appropriate.

170.    **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder is impractical.  Comet Loans, Inbox Loans, Inbox Credit, First Loan, and Better Day Loans were all heavily marketed in Florida and made a considerable number of loans to Florida consumers.  Class members are therefore spread throughout the state of Florida. Although the precise number of Class members is unknown, on information and belief, there are at least 1,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants.  The Class members may be notified of the pendency of this action by published or mailed notice.

171.    **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the CRCPA Class which predominate over questions affecting any individual Class member. Specifically, these common questions include, without limitation: (a) whether the Defendants and associated persons constitute an *Enterprise* as defined by § 772.102(3), Fla. Stat.; (b) whether each loan made to members of the Class by Comet Loans, Inbox Loans, Inbox Credit, First Loan, or Better Day Loans amounts to an *Unlawful Debt* as defined by § 772.102(2)(a)(3), Fla. Stat.; (c) whether the Defendants conspired to collect an unlawful debt; (d) whether the Defendants received income derived from the collection of an unlawful debt; (e) whether the Defendants used or invested the part of that income to acquire an interest in, to establish, or to operate the enterprise; and, (f) whether Plaintiff and the Class members were harmed by the Defendants.

## The RICO Class

172.    Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

173.    Pursuant to Fed. R. Civ. P. 23(b)(2), (b)(3) and/or (b)(4), Plaintiff brings this action for herself and on behalf of the following classes of which she is a member, initially defined as**:**

**All consumers: (1) located in Florida; (2) whose employer, within four years of the date of the filing of this complaint, received a "Wage Assignment Demand Notice" or similar notification, from Valley Servicing or Apex Servicing, regarding a loan issued by First Loan, Comet Loans, Inbox Loans, Inbox Credit, or Better Day Loans (the "RICO Class").**

174.   Excluded from the RICO Class are the Defendants and any of their officers, directors, and employees.

175.   Plaintiff reserves the right to modify or amend the RICO Class definition before the Court determines whether certification is appropriate.

176.   **Numerosity. Fed R. Civ. P. 23(a)(1).** The Class members are so numerous that joinder is impractical.  Comet Loans, Inbox Loans, Inbox Credit, First Loan, and Better Day Loans were all heavily marketed in Florida and made a considerable number of loans to Florida consumers.  Class members are therefore spread throughout the state of Florida.  Although the precise number of Class members is unknown, on information and belief, there are at least 1,000 members, the names and addresses of whom are identifiable through documents and business records maintained by the Defendants.  The Class members may be notified of the pendency of this action by published or mailed notice.

177.   **Existence and Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** There are questions of law and fact that are common to the RICO Class which predominate over questions affecting any individual Class member. Specifically, these common questions include, without limitation:

(a) whether the Defendants and associated persons constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4); (b) whether the activities of the Defendants or the enterprise affected interstate commerce; (c) whether loans made to members of the Class by Comet Loans, Inbox Loans, Inbox Credit, First Loan, or Better Day Loans amount to unlawful debts as defined by 18 U.S.C. § 1961(6); (d) whether the Defendants conspired to collect unlawful debts; (e) whether the Defendants received income derived from the collection of such unlawful debts; (f) whether the Defendants used or invested part of that income to acquire an interest in, to establish, or to operate the enterprise; and, (g) whether Plaintiff and the Class members were harmed by the Defendants

## For All Classes

178. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each Class member, which all arise from similar operative facts and are based upon the same legal theories. All of the Lending Websites made loans to Florida consumers at rates vastly exceeding the maximum lawful rate.   These loans were then assigned to Red Cypress Group, who collected the loans through unlawful wage assignment notices sent directly to the Florida consumers' employers.  Plaintiff has no interest adverse or antagonistic to the interests of other members of the Class and has the same claims for statutory damages that she seeks for members of the Class.

179. **Adequacy of Class Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the FDCPA Class, the FCCPA Class, the CRCPA Class, and the RICO Class, and will fairly and properly protect the interests of the Classes. Plaintiff has retained experienced counsel who have litigated well over one thousand consumer cases under consumer protection statutes, including RICO and the FDCPA. Plaintiff's counsel are competent in the prosecution of class action litigation and intend to prosecute this action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of members of the FDCPA Class, the FCCPA Class, the CRCPA Class, and the RICO Class.

180. **Predominance and Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the Class members predominate over questions affecting only individual Class members. Under the totality of the circumstances, a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy. The Defendants' conduct described in this Complaint stems from common and uniform practices, resulting in systematic violations of RICO, the CRCPA, the FCCPA and the FDCPA. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory

judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by the Defendants' conduct.

181.     **Injunctive Relief Appropriate for the Defendants, Class. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have and continue to act on grounds generally applicable to the Class, making appropriate injunctive relief with respect to Ms. Fair and the Class members.  Ms. Fair and the putative Class seek an injunction prohibiting the Defendants from continued collection of these illegal loans and ordering the dissolution of each corporate Defendant that has engaged in any enterprise pled herein.

**COUNT I**
**VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692e**
**(Class Claim on behalf of the FDCPA Class against**
**Collins and Red Cypress Group Only)**

182.     Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

183.     The loans issued by the Lending Websites to Ms. Fair and the Class each charged an interest rate far in excess of the permissible rate under Florida law and, thus, the loans are unenforceable.

184.     Collins and Red Cypress Group violated § 1692e of the FDCPA when Red Cypress Group, acting pursuant to policies put in place by Collins, used false

and deceptive representations in connection with the collection of a debt, by indicating to Ms. Fair, the Class, and their employers that they owed amounts that they did not owe, deceptively labeling the debts as legal, valid, and enforceable when they were not, and by falsely representing they could collect such loans through a "Wage Assignment Demand Notice," despite such wage assignment being invalid in Florida.

185.    Class members suffered actual damages in the form of money withheld from their paychecks and sent to Defendants, as a result of Collins and Red Cypress Group's violations of § 1692e.

186.    Accordingly, Collins and Red Cypress Group are jointly and severally liable to Ms. Fair and each putative Class member for actual damages, statutory damages of up to $1,000.00 per defendant, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

## COUNT II
## VIOLATIONS OF THE FDCPA, 15 U.S.C. § 1692f
### (Class Claim on behalf of the FDCPA Class against
### Collins and Red Cypress Group Only)

187.    Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

188.   The loans issued by the Lending Websites to Ms. Fair and the Class each charged an interest rate far in excess of the permissible rate under Florida law and, thus, the loans are unenforceable.

189.   Collins and Red Cypress Group violated § 1692f of the FDCPA when Red Cypress Group, acting pursuant to policies put in place by Collins, attempted to collect amounts which were not permitted by law.  Specifically, Collins and Red Cypress Group attempted to collect loans issued by the Lending Websites which were unenforceable and illegal due to the application of interest rates which violated state law.

190.   Class members suffered actual damages in the form of money withheld from their paychecks and sent to Defendants, as a result of Collins and Red Cypress Group's violations of § 1692f.

191.   Accordingly, Collins and Red Cypress Group are jointly and severally liable to Ms. Fair and each putative Class member for actual damages, statutory damages of up to $1,000.00 per defendant, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

**COUNT III**
**VIOLATIONS OF THE FDCPA - 15 U.S.C. § 1692c(b)**
**(Class Claim on behalf of the FDCPA Class against**
**Collins and Red Cypress Group Only)**

192.    Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

193.    Collins and Red Cypress Group violated § 1692c(b) of the FDCPA when Red Cypress Group, acting pursuant to policies put in place by Collins, communicated with Ms. Fair's and each Class member's employer through use of a "Wage Assignment Demand Notice," in connection with the collection of a debt, without consent.

194.    Class members suffered actual damages in the form of money withheld from their paycheck and sent to Defendants, as a result of Collins and Red Cypress Group's violations of § 1692c(b) of the FDCPA.

195.    Accordingly, Collins and Red Cypress Group are jointly and severally liable to Ms. Fair and each putative Class member for actual damages, statutory damages of up to $1,000.00 per defendant, costs, and attorney's fees pursuant to 15 U.S.C. § 1692k.

**COUNT IV**
**VIOLATIONS OF THE FCCPA, § 559.72(9), FLA. STAT.**

**(Class Claim on behalf of the FCCPA Class against all Defendants)**

196.   Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

197.   Each loan issued by the Lending Websites to Plaintiff and Class members carried an interest rate far in excess of the permissible rate under Florida law and, thus, the loans are unenforceable in Florida.

198.   The Defendants violated § 559.72(9), Fla. Stat., of the FCCPA when they attempted to enforce the loans issued by the Lending Websites via "Wage Assignment Demand Notices" sent to Ms. Fair's and the Class members' employers, therein asserting the legal right to collect the loans and to do so via wage assignment, when no such legal right exists in Florida.

199.   The Defendants' actions were willful, intentional, and done for the express purpose of collecting an unenforceable debt from Plaintiff and the Class and profiting from it.

200.   The Defendants knew of the illegal nature of the loans and the illegality of their wage assignment notices, as the Defendants have had multiple prior lawsuits filed against them for substantially similar collection activities.

201.   Class members suffered actual damages in the form of money withheld from their paycheck and sent to Defendants as a result of the Defendants' violations of § 559.72(9), Fla. Stat.

202.    Accordingly, the Defendants are jointly and severally liable to Ms. Fair and each putative Class member for actual damages, statutory damages of up to $1,000.00 per defendant, punitive damages, costs, and attorney's fees pursuant to § 559.77, Fla. Stat.

## COUNT V
## VIOLATIONS OF THE FCCPA, § 559.72(4), FLA. STAT.
**(Class Claim on behalf of the FCCPA Class against all Defendants)**

203.    Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

204.    The Defendants violated § 559.72(4), Fla. Stat., of the FCCPA by communicating, without consent, with Ms. Fair's and each Class members' employer, in connection with collection of a loan issued by the Lending Websites, without first obtaining a judgment from a Florida or other court for such loan.

205.    Having been sued for similar actions in the past, the Defendants knew that communicating directly with Ms. Fair's and each Class members' employer, without prior consent, for the purpose of collection, was illegal.

206.    The Defendants' actions were thus willful, intentional, and done for the express purpose of collecting unenforceable debts from Plaintiff and Class members and profiting from it.

207.   Class members suffered actual damages in the form of money withheld from their paycheck and sent to Defendants as a result of the Defendants' violations of § 559.72(4), Fla. Stat.

208.   Accordingly, the Defendants are jointly and severally liable to Ms. Fair and each putative Class member for actual damages, statutory damages of up to $1,000.00 per defendant, punitive damages, costs, and attorney's fees pursuant to § 559.77, Fla. Stat.

## COUNT VI
## VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.
### (Class Claim on behalf of the CRCPA Class against all Defendants)

209.   Plaintiff adopts and incorporate paragraphs 1 – 153 as if fully restated herein.

210.   The loans issued by the Lending Websites to Ms. Fair and the Class each charged an interest rate in excess of the permissible rate under Florida law and, thus, the loans are unenforceable and constitute *Unlawful Debt* under the CRCPA, § 772.102(2)(a)(3), Fla. Stat.

211.   The Defendants violated § 772.103(4), Fla. Stat., of the CRCPA by conspiring with each other, and other persons, including the Kashia Tribe, and the WLCC, to issue and collect unlawful debts issued by the Lending Websites, through use of "Wage Assignment Demand Notices," despite wage assignments being invalid per § 516.17, Fla. Stat.

212.    The Defendants agreed to participate in the CRCPA conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through use of "Wage Assignment Demand Notices" – as evidenced by the issuance of a "Wage Assignment Demand Notice" to Ms. Fair's and the putative Class members' employers.

213.    Defendants and associated persons constitute an *Enterprise* as defined by § 772.102(3), Fla. Stat.

214.    The Defendants endeavored to associate with the enterprise to collect unlawful debts.

215.    Class members suffered actual damages in the form of money withheld from their paycheck and sent to Defendants as a result of the Defendants' violations of § 772.103(4), Fla. Stat.

216.    Accordingly, the Defendants are jointly and severally liable to Ms. Fair and the putative Class members for treble damages, costs, and attorney's fees pursuant to § 772.104(1), Fla. Stat.

## COUNT VII
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)

217.    Plaintiff adopts and incorporates paragraphs 1 – 153 as if fully restated herein.

218.    The loans issued by the Lending Websites to Ms. Fair and the Class carried an interest rate more than double the permissible rate under Florida law and, thus, the loans are unenforceable and constitute an *Unlawful Debt* under RICO, 18 U.S.C. § 1961(6).

219.    The Defendants violated 18 U.S.C. § 1962(d) by conspiring with each other, and other persons, including the Kashia Tribe, and the WLCC, to issue and collect unlawful debts issued by the Lending Websites through use of "Wage Assignment Demand Notices."

220.    The Defendants agreed to participate in the RICO conspiracy and agreed to the overall objective of the conspiracy – to collect unlawful loans through use of "Wage Assignment Demand Notices" – as evidenced by their issuance of a "Wage Assignment Demand Notice" to Ms. Fair's and the putative class members' employers.

221.    Defendants and associated persons constitute an *Enterprise* as defined by 18 U.S.C. § 1961(4).

222.    The Defendants participated in the enterprise to collect unlawful debts.

223.    The enterprise in which the Defendants participated utilized and effected interstate commerce when they used the mail, telephone, and/or the internet across state lines to:

    a.   send collection correspondence to Class members;

    b.   collect unlawful debts;

    c.   maintain and exchange information regarding unlawful debts; and/or

    d.   communicate with members of the enterprise.

224.   Class members suffered actual damages in the form of money withheld from their paychecks and sent to Defendants, as a result of the Defendants' violations of 18 U.S.C. § 1962(d).

225.   Accordingly, the Defendants are jointly and severally liable to Ms. Fair and the putative class members for treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court enter judgment on behalf of herself and the classes she seeks to represent against Defendants for:

    a.   Certification for this matter to proceed as a class action;

    b.   An award of actual, treble, punitive, and statutory damages as pled herein;

    c.   Injunctive relief as pled herein;

    d.   An award of pre-judgment and post-judgment interest as provided by law;

    e.   An award of attorneys' fees, litigation expenses, and costs of suit;

    f.   Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Ms. Fair hereby demands a jury trial on all issues so triable.

Respectfully submitted on April 19, 2023**,** by:

**SERAPH LEGAL, P. A.**

*/s/ Carolyne Moomaw*
Thomas M. Bonan, Esq. (FBN: 118103)
Carolyne Moomaw, Esq. (FBN: 21889)
Philip R. Goldberg (FBN: 105940)
Bryan J. Geiger, Esq. (FBN: 119168)
Brandon D. Morgan, Esq. (FBN: 1015954)
Bridget L. Scarangella (FBN: 1022866)
Alexander J. Wilde (FBN: 1035431)
1614 N. 19th St.
Tampa, FL 33605
Tel: 813-567-1230
Fax: 855-500-0705
TBonan@SeraphLegal.com
CMoomaw@SeraphLegal.com
PGoldberg@SeraphLegal.Com
BGeiger@SeraphLegal.com
BMorgan@SeraphLegal.com
BScarangella@SeraphLegal.com
AWilde@SeraphLegal.com
*Attorneys for Plaintiff*

## ATTACHED EXHIBIT LIST

A       IP Address Location for InboxLoan.com

B       Domain Registration Records for InboxLoan.com, Record Date: June 16, 2014

C       Unrelated Consumer's TransUnion Disclosure Including Inbox Loan Inquiry

D       Valley Servicing Website, Accessed June 3, 2022

E       Apex Servicing Website, Accessed June 3, 2022

F       Red Cypress Group PPP Loan Information

G       Business Located at 333 South Main Street, Blanding, Utah 84511

H       Apex Servicing Wage Assignment Demand Notice

I       Notice of Settlement, February 17, 2021 - Excerpt

J       Wage Assignment Demand Sent to Ms. Fair's Employer, June 30, 2022 – Excerpt

K       Wage Assignment Demand Sent to Ms. Fair's Employer, October 4, 2022 - Excerpt